Good morning, Your Honors. Good morning. It pleases the Court, James Fife of Federal Defenders, appearing on behalf of the Appellant, Mr. Rodriguez. Because the- I'd like to reserve one minute for rebuttal. The government prosecutor intentionally precipitated the defense's successful mistrial motion in order to secure several strategic advantages. The double jeopardy clause therefore barred Mr. Rodriguez's retrial. There's substantial evidence in all three categories indicative of prosecutor intent recognized by this Court in Loon, far more than is necessary to warrant an evidentiary hearing under the parameters discussed in Haguea. The District Court therefore erred both in not dismissing the indictment and in denying a hearing on the prosecutor's subjective intent. Well, the District Judge was there for the whole thing. All counsel are officers of the Court and under an obligation to be truthful in all that they say to the Court. What would have been- why was it an abusive discretion for the judge not to hold an evidentiary hearing to hear what he already knew? Your Honor, I don't think it was an abusive discretion for the judge to have an evidentiary hearing because that would virtually eliminate any kind of evidentiary hearing in a situation like this. Not always. And here what I'm suggesting is that there in fact, in effect, excuse me, was an evidentiary hearing because counsel was there presumably telling the truth because he has an obligation to it every bit as much as he does if he stands up and sits on the stand. So it's not a question of having other witnesses. Well, Your Honor, I think there's also evidence to show that things weren't as cut and dried as either the District Court or the government likes to make out. That it wasn't just simply a matter of asking the prosecutor, what was your intention? Did you intend to do this? Because now it appears the record, as the government has been arguing, it seems like the record is subject to some very different interpretations. I guess the way I kind of look at this thing is just exactly the way the judge did at the end of the day. While it was going on, it sort of seemed worse than it does when you go back and you actually look at what was really said and done. And when it's really said and done, it doesn't leave much question about some kind of really nefarious intent to crash the trial. Well, I understand that, Your Honor. It would be sloppy witness preparation or whatever. That may be the case. I'm thinking, I mean, neither Mr. Miller nor I were a trial counsel, and we're all in the same situation here, the same situation that the District Court put itself in. So we've always recognized that there's a very big difference between what it appears like there at the time. That's why we give deference to the District Court who saw what was going on at the time. The judge came back and looked at the cold record the same way that we're looking at the cold record. So it is interesting that the judge did come to almost a 180-degree different view of things. And it wasn't a very big deal. I think you have to agree with me. Well, it was the consistency of the pattern. It was something that started way before the trial started, that this was going on, that there was problems all through it. As the and unnecessarily so. And that's fully substantiated by the record. But in this case, counsel, the standard, I believe, is abuse of discretion, is it not? For granting the hearing, correct. Right. And in this case, what can you point to that, or you believe, that the District Court truly abused its discretion? I mean, admittedly, reasonable minds can disagree about things. But we're talking about an abuse of discretion here. What did the District Court do, other than to fail to order the hearing, the evidentiary hearing, from your perspective? What was happening? I mean, the government trial was going pretty well. The counsel for the government said they had no such intention. There was no scienter involved. What happened that would constitute an abuse of discretion from your perspective? Just specifically about the hearing, I think there's a couple of points. First of all, there was legal error. And that, by definition, is abuse of discretion. I believe the court, by applying this almost completely deferential standard, that, well, since I was here and I saw it, there was never going to be any need for a hearing. I think that's contrary to the view that was taken in Haguega. Because I believe that Haguega, even though the court there did not specifically decide between the two different tests that it discussed, it very clearly was relying more on the Seventh Circuit test, which I would argue is more consistent with what the Supreme Court said in Kennedy. The Supreme Court said we should treat this like any other issue of intent, and we're not going to treat it in any other special fashion. But the Eighth and the Sixth Circuit, it's a highly deferential standard. And as you point out, our circuit did not adopt either of these tests. I understand why you want to adopt the Seventh Circuit test. But since our court specifically did not adopt one, and two circuits have said it's highly deferential, do you believe that with that standard that we would have some basis to overturn this verdict based upon the court's failure to order an evidentiary hearing on this matter? I think so, Your Honor, because applying the test in Olseni in the Seventh Circuit case, there's two steps to it. First of all, were the explanations plausible? And second, in the context of a case that was otherwise going well for the prosecution. Do you agree that the case was going well for the government? I disagree, Your Honor. I believe the case was in a shambles, and that's exactly what the district court felt. I think that that was very much what the prosecutor himself admitted on the record. He says we're floundering here. Those were his very words. That's a little dramatic or firing for effect or whatever. I mean, I can't imagine. Maybe it's true. I can't imagine in San Diego that it discombobulates the U.S. Attorney's Office when a phantom drug, I mean, the bad guy, you know, comes up at trial. I mean, it's got to happen all the time. Well, at the very least, Your Honor, it certainly raises an interesting question of what was the only, the best evidence we have of what the prosecutor was thinking was what he told the district court. He says we're floundering. He says right now we don't know who he is. We don't know how he's even related to the case. We're going to be scrambling in this box to find Mr. Castillo. He said it's made very clear in the opening statement about this person called Carlos Castillo, I believe. We have zero information on that, zero. We have absolutely nothing about that. And then he goes on later to say because right now, let's face it, he's in a car with a lot of drugs and it's his car. That's all we have. That's all we've ever had from the very beginning of this case. He's admitting that his case was probably weak or at least he subjectively felt it was weak and now saddled with a burden which he said was his duty as a public official to now investigate thoroughly this new allegation that Carlos Castillo was the person. Well, if you had an evidentiary hearing, what would you expect that you would be able to accomplish with it? I think as in Kennedy, where they had such an evidentiary hearing, and in Oseni, which ordered a similar sort of hearing, to have the prosecutor on the stand under oath testify to what was his motivations here. We had representations. That's true, Your Honor, and he was under an obligation to be candid with the court. But I say the record shows he was not being candid. Not only was his explanations in many cases implausible, they were contradicted. We can say that they were false. But, I mean, that shows on the record from your point of view, right? Correct, Your Honor, and just for a moment, I would ask the court to formally rule on the request for judicial notice of the prior case. Right, of the other case where he had been admonished over Valley Gomez. Correct, where the objection was raised and specifically referred to as Valley Gomez error. How long ago was that? How much time elapsed between that admonition and that trial and your client's trial? This was about between five and six months, I believe. There's a fairly big difference. I mean, I don't even see that this comes anywhere close to being that kind of error, because here the agent couched his response in terms of explaining why he thought it, he, the agent, thought it was necessary to inquire both in Spanish as well as English by saying when I was doing English, yeah, you'd blank and I wasn't sure it was being understood, so I tried Spanish. I understand that, Your Honor, and that would make sense if he'd only done it once. If he'd stepped into this minefield by mistake one time and said, yes, now you're talking about silence, but then immediately after a Fifth Amendment objection from the defense, he goes back and asks the same line of questioning again and elicits the silence a second time. Now, that can't be inadvertent, especially when not only did he do that in the Morales case and was admonished by Judge Whelan not to do it again in the second trial. He did do it in the second trial a second time. There was no objection, but it didn't matter because Ms. Morales was acquitted in that case. So there's a clear pattern here, and I would say this is precisely 404B evidence, Your Honor, that there is a plan, there's intent, there's a lack of knowledge and a lack of mistake in this case showing that this is a consistent pattern. And when the prosecutor told the district judge, I'm unfamiliar with Velarde Gomez, that is demonstrably false. He must know. That was a case prosecuted out of his own office. How could he not know that case? And then he went on and said statements which may indicate he didn't even seem to be familiar with the fact pattern of that case. He says, well, if that happened in that case, how could he not know that? How many people are there in that office? Your Honor, Mr. Miller could give better information on that. Are we talking about 20, 100? Probably thousands of people. Perhaps, Your Honor, but Velarde Gomez was a very important criminal decision. I'll make a deal with you. If you'll reserve what time you don't have left, I won't ask you if you know all the cases that are presently pending in the Federal Public Defender's Office. No, Your Honor, but on the same hand, I haven't been specifically admonished by a district judge for violating one of those. I certainly would have remembered it, especially in a case that resulted in an acquittal. I will reserve my remaining time. Thank you, Mr. Miller. First of all, Mr. Miller, why isn't Mr. Ching here? Because he left the office and is now an assistant with the Northern District of California in their computer crimes. And upon his leaving the office, I was assigned this case. I handled this appeal. I also handled the subsequent sentencing and the safety of the briefing and the recommendation and ultimately the sentencing. So that's where he is and that's why I'm appearing. But in this case, Judge Benitez did not clearly err in making the factual finding that Mr. Ching did not have the intent to provoke a mistrial, nor did he abuse his discretion in denying a full-blown evidentiary hearing, because Judge Benitez had all the information that he needed in order to reach that factual finding. Now, the defendant argues that once he disclosed that he was going to blame Carlos Castillo, the government's case crumbled. Now, in your argument ---- But isn't that what Mr. Ching said, though? Didn't he say, I'm flattering here, all I have is this and this, I don't have anything to go on? And then as soon as the judge declared a mistrial, he immediately sought a whole bunch of discovery that he was not entitled to? I believe that the floundering was in response to asking for the discovery. Right, he fell. I think there's ---- I'm not saying that the abuse of discretion standard is pretty deferential here, but I do think there's basis in the record for concluding that the government's case was not going well. And one of the basis in the record is the U.S. Attorney's own statements. Now, am I mistaken? I thought that those comments were once he was asking for disclosure of the information related to Carlos Castillo. I don't know, but he was describing his case as I'm floundering, all I have is X, Y, and Z. Now, I agree with Judge Reimer that it shouldn't be a surprise to an AUSA in San Diego that the defense is, you know, someone else put the drugs in my car, and I have no knowledge there was drugs in my car. Right. I mean, that's the typical defense that apparently, I don't know, maybe there was an eggshell prosecutor here who was thrown apart by this because he said he was floundering. No. He, Mr. Chang was extremely experienced. And in this case, we had very strong evidence. Well, he makes it worse, not better. Right. That's correct. But, I mean, in this case, one of the tests for the Hegegi factors is whether or not the trial was going poorly. Now, just because defendants throw up hurdles and roadblocks doesn't mean that the case is going poorly. But the lawyers, I'm taking it for a given the case was going poorly because the AUSA described it as such. He said, I'm floundering, all I have is the drugs in the car. And this trial gave him, he had a lot to gain by that. He had time. He could do further investigation. He could get more than just the drugs in the car. He might be able to convince the judge to give him discovery. Who knows? But there's nothing within the context of what happened, what he said, and how he said it that leads to even the reasonable inference that he had the intent to revoke them to prove for a mistrial. Well, and the other thing, the other issue that I think showed is he had already committed a reversible error. He had already committed Doyle-Griffin error. And if that had gone up on appeal, as it stood on that record, and it had not been declared a mistrial at that point, having committed this reversible error, he wouldn't have had a great case to bring up to the Ninth Circuit, given the Doyle-Griffin and Velarde-Gomez error. And I don't think for a second he didn't remember that when you get admonished by a district court judge in the middle of a trial, I'm sure that creates a searing memory. I mean, it's not usual for a district court judge to really be that stern or strong with a prosecutor. I understand that. But I think that there is a distinction on a number of different levels of whether or not it was error. And once we get to whether or not the evidence that was presented would, in fact, have been error commenting on a silence rather than putting it in context of whether he understood. But didn't Judge Benitez think it was error? Did who? Judge Benitez. He felt that it was error. He said it was error. Yes, after having overruled the objection. But ‑‑ I know. I know. Judge Benitez could have ruled earlier. That's true. So there's a lot of sloppy things going on here. But the standard here is whether or not there's evidence that Mr. Chang had the intent to revoke the motion for mistrial. Now, we have a look at what was said, but also what Mr. Chang did to request that and whether what was said was, in fact, error. Now, what he asked was, how did you physically go about arresting him? And he went through the description. Well, I handcuffed him. I patted him down. I then escorted him. I told him he was going to be contacted by agents. All right. So let's give that one a pass. Right. Let's give that one a pass. Okay. What about the second time? The explanation as to whether or not ‑‑ it wasn't whether or not he was going to remain silent. It's a request to see whether or not he understood what was going on. Because we also have to prepare for the eventuality that the defense argues, don't look how poorly the agents and inspectors treated my poor client. Here's this young man, this youth, and they didn't even know whether or not he understood what was going on because he's just scared. So don't ‑‑ I want you to acquit my poor client, not because he didn't do it or the government didn't prove it, but because you ought to punish the government for having to handcuff him and lay hands upon patting him down and then speaking at him in Spanish and firing questions at him without determining whether or not he understood what was going on. I'm sorry. Where's this argument going? That it was okay to elicit that testimony? He did not elicit that testimony. It was not in response to those questions. The agent made those comments. He said, why did you do it in Spanish? Now, it wasn't to elicit because he remained expressionless, which within that context isn't ‑‑ How do you know that unless you have an evidentiary hearing and you find out whether or not he had prepared his witness to actually make those statements? Because within the theory of the defendant's appeal, which is once we did our opening statement and disclosed that it was Carlos Castillo, then the U.S. attorney decided that he was going to craft these questions that are going to elicit this comment about him being expressionless. But as I stated in my brief, there was no opportunity for him to so deviously conspire on this agent. He did the opening statement, he called his witness, got the question and got the responses to those questions. And in those responses was comments by the agent that he was expressionless. But the answer to, why did you do it in Spanish, the answer, so I could know that he understood what was going on. But it wasn't with any intent to elicit that he was expressionless. He didn't have the time to prepare him to do that. Mr. Miller, you mentioned earlier that Mr. Chang was experienced. How many years was he with your office? Ten. Over ten. Over ten. And any idea how many trials he handled during that period of time? Too many to count. It would have been at least over 50, possibly more. Would it be fair to say that he would be expected to be familiar with Ninth Circuit law and the rules under which he's supposed to conduct the trials? Yes. It would be. But if you were to deduce... Isn't this an evidentiary hearing? Aren't we eliciting evidence beyond the record? I mean, isn't that what you do on an evidentiary hearing? You find out, was this guy experienced? What did he know? Did he write a note to his witness? Isn't that what you do on the evidentiary hearing? When you have... When it's in the context of no break between opening statement and the question, and by the bare question of... You've never written a note to your witness saying, you know, if I say this, you say this? You've never done that? No, I've never done that. I mean, I... I wasn't going to go down this line, but I think I'm going to go down this line. Tell me what you told me the first time we talked. No. Before trial... Tell me what you told me the first time we talked. In the middle of trial, I wouldn't have the ability to communicate that adequately to the witness. Maybe I'm misunderstanding your question. I'm just saying that, you know, okay, opening... You're saying that he wouldn't have had time. Your argument is he announced about Castillo in opening argument, and there wouldn't have been time to communicate with his witness. But don't lawyers communicate with their witnesses by little notes all the time? You must have tried some cases with witnesses, right? Yes, I've tried many cases with many witnesses. Okay. You've never communicated with a witness via a note? I have sent notes out to witnesses, but never... Usually it's the defense has just said this. Is this true? Okay, but we don't know. I think the point here, I think we're a little bit perhaps off the point. I think you were saying that the witness was put on the stand immediately after... Yes. ...after, and the record doesn't reflect the break. Yes. Or approaching the witness. And that's information that Judge Benitez had to reach the... All that matters is what's in the record. Yes. At this point. Correct. And that's why I think it leaves the reasonable deduction that Judge Benitez did not clearly err in reaching the factual finding that Mr. Chain did not have that intent. Is it in the record where the witness was when he was called? Was he sitting... Is it in the record whether he was sitting next to the U.S. attorney? We may fairly deduce that he was outside the court. And how do we deduce that? Because the witnesses were excluded. Okay. And that the only agent sitting next to Mr. Chain was Agent Gruntz. Okay. And he was designated as the case agent, so he sat in court during that time. So they had to call him out from the hallway. Okay. But I think that within what was asked, how it was asked, and with the other alleged errors and complaints that the defendant made, that Judge Benitez did not clearly err at finding that he had no intent. And that really the defense strategy was to move from mistrial at the earliest opportunity. Thank you, Mr. Miller. Mr. Feiffer. Can you give me four quick points? Take a little extra time because the counsel for the government had a little extra time. Okay, thank you. First of all, as regards to the issue we were just talking about, whether he had time to prepare this witness, the 404B evidence shows that this is a practice of this particular prosecutor. He would have known in advance that he might be getting into one of these areas and that this was his practice. So this is not something that he had to think of at the last minute and signal to the witness. He could have prepared the witnesses in advance for this or prepared himself to elicit this kind of evidence. I'd also like to point out that in both Loon and Haguega, the court pointed out that the prosecutors there objected and sometimes objected strenuously to the mistrial. There was no objection here to the mistrial. Mr. Chang never said anything in opposition to the mistrial. He merely tried to defend personally his actions, the misconduct that he engaged in. He never said a mistrial is inappropriate. He never objected to the mistrial once it was actually made. The district court researched and found the case law relevant to the Doyle-Griffin error, the Velarde-Gomez error. He even said that not only was this error, but that he said specifically he thought that the government could not even prove it was harmless. That is, he was already convinced that it was beyond harmless error. However, the district court did revisit these decisions and came to very different decisions once the motion to dismiss the indictment came up. The view is so diametrically opposed that it seems unreasonable. In fact, the clearest indication of that is that when Judge Benitez ruled that the motion under double jeopardy was frivolous, having looked at all that evidence and decided that there was enough here to stop a federal criminal trial in mid-stride, he looks at the same evidence and then says this is frivolous. That seems a rather unreasonable conclusion to reach. It only allowed the judge to retain jurisdiction and allow the second trial to go ahead. Those are the four points I wanted to make. Mr. Fyfe, just a quick question. What is it that you're asking this court to do, to reverse and remand for a new trial or reverse and remand with dismissal based on double jeopardy? I believe the evidence here exceeds that shown in any of the case law that's been cited to this court to show that there was an intentional provocation of a mistrial. Therefore, the double jeopardy bar has been raised. The district court erred in making that decision. This court, like any district court decision, can find that that was incorrect, reverse on the basis that double jeopardy bar had been raised, and therefore the indictment should have been dismissed and the retrial, the second trial, has to be vacated. All right. Thank you, Mr. Fyfe. Of course, in the alternative, a hearing on this, because there seems to be quite a bit of contention about what really went on here. In different interpretations, at the very least, an evidentiary hearing was justified in this case. Thank you. Thank you, counsel. The matter just argued will be submitted and the court will stand adjourned.
judges: Rymer, Wardlaw, Smith